UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WELLINGTON MANAGEMENT COMPANY, LLP,)
     Plaintiff,               ) CIVIL ACTION NO.
                            ) 98-10916-DPW
          v.             )
                            )
RJR NABISCO, INC.,        )
     Defendant.             )

MEMORANDUM AND ORDER
September 30, 1999

    Wellington Management Co., LLP and RJR Nabisco, Inc. have
sued each other in a tangled web of claims and counterclaims
stemming from the 1996 departure of partner Arnold C. Schneider
III from Wellington.  After leaving Wellington, Schneider
continued to work for RJR Nabisco, formerly a Wellington client,
in violation of a non-competition agreement.  In a separate
action against Schneider, Wellington obtained an injunction
preventing Schneider from working for former clients, including
RJR Nabisco.  In this suit, RJR Nabisco brings claims against
Wellington alleging violations of the Employee Retirement Income
Security Act (ERISA), breach of contract, common law claims for
breach of fiduciary duty, fraud and misrepresentation, and unfair
and deceptive trade practices under Mass. Gen. Laws ch. 93A.
Wellington in turn has asserted counterclaims accusing RJR
Nabisco of aiding and abetting a breach of fiduciary duty and
interfering with a contractual relationship.  Each side has now
moved for summary judgment on the other side's claims.  I will
grant RJR Nabisco's summary judgment motion in its entirety and I

1





will grant Wellington's motion in large part but will deny summary judgment as to RJR's claim for breach of the contractual provision obligating Wellington to transfer RJR's portfolio "as directed" by RJR.

## I. BACKGROUND

Wellington is a Massachusetts limited liability partnership whose business is investment management.  (Pl.'s Statement of Undisputed Material Facts ("Wellington Facts") ¶ 1.) Wellington's Partnership Agreement, at all times relevant to this action, contained a clause mandating that partners not compete with Wellington after they left the firm.  (Id. ¶ 2.)  Prior to 1990, the agreement required partners not to compete for twelve years after leaving the firm.  In 1990, Wellington amended the agreement to provide that partners could not compete with the firm for three years and could not solicit or accept business from Wellington clients for five years.  The amendment also allowed Wellington's Managing Partners Committee to waive the non-competition agreement in individual cases.  (Id.)

RJR is a multi-faceted corporation formerly headquartered in Georgia and now headquartered in New York and incorporated in Delaware.  (See Mem. of RJR Nabisco, Inc. in Opp'n to Wellington Management Co., LLP's Mot. for Summ. J. (RJR Mem. I") at 21 n. 10.)  RJR has a group of pension plans benefitting its employees and pensioners.  In managing these plans, RJR diversifies the plans' assets across different asset classes and among different investment managers.  (Id. at 2.)  RJR asserts that its selection

2

of an investment manager depends upon the skill and style of that manager rather than the firm for which the manager works.   (<u>Id.</u> at 3; Shultz Aff. ¶ 3; MacMurray Aff., Ex. A to Blank Aff., ¶ 10.)

## A. The Underlying Dispute

RJR and Wellington entered into an investment management agreement on October 1, 1987, under which Wellington partner John Nyheim would manage a set of assets for RJR's pension plans. (Wellington Facts ¶¶ 3-4; RJR Mem. I at 3.)   RJR asserts that Wellington was selected because Nyheim was personally well known to Robert Shultz, RJR's Vice President for Pension Asset Management.   (RJR Mem. I at 3.)

The Investment Management Agreement contains several sections relevant to this dispute.   Paragraph 7 states, "The Manager is not authorized to take title to or possession of any of the assets of the Portfolio or to otherwise act as the custodian of such assets.   (Investment Management Agreement ("IMA"), Ex. A to RJR Mem. I ¶ 7.)   Paragraph 8 states:

> The Manager shall promptly notify the Chief Financial
> Officer if any substantial change in the duties of any or
> all of the following individuals is either contemplated or
> effected:
>      Mr. John A. Nyheim
>      Partner & Senior Vice President
>
>
>      Mr. John R. Ryan
>      Partner & Senior Vice President

(<u>Id.</u> ¶ 8.)

Paragraph 10 states:

<u>Fiduciary Standards</u>.   The Manager shall carry out its

> responsibilities under this Agreement in accordance with the
> standards of conduct applicable to it as a fiduciary under
> ERISA.  The Manager shall manage the Portfolio assets solely
> in the interest of the participants and beneficiaries of the
> Plans with the care, skill, prudence and diligence under the
> circumstances then prevailing that a prudent man acting in a
> like capacity and familiar with such matters would use in
> the conduct of an enterprise of a like character and with
> like aims.

(Id. ¶ 10.)

> Paragraph 16 provides:

> Upon termination of this Agreement, Manager will take
> all reasonable actions to protect and preserve the
> Portfolio and will transfer the Portfolio as directed
> by the Chief Financial Officer.

(Id. at ¶ 16.)

Wellington did not inform RJR of the non-competition agreement within its partnership agreement in 1987 before the IMA was signed or in 1990 when the non-competition agreement was altered.  (Wellington Facts ¶ 3; RJR Mem. I at 6.)

In 1987, Arnold C. Schneider, III was a research analyst for Wellington who worked under Nyheim.  (Wellington Facts ¶ 9; RJR mem. I at 5.)  Schneider became a Wellington partner and signed the partnership agreement on January 1, 1992.  (Wellington Facts ¶ 10; RJR Mem. I. at 5.)  Upon the recommendation of Wellington partners, RJR selected Schneider to replace Nyheim as investment manager for its account upon (or in anticipation of) Nyheim's retirement in 1992.  (Wellington Facts ¶¶ 11-12; RJR Mem. I at 5.)  However, the parties dispute the sequence of these events. Wellington asserts that RJR selected Schneider, and Schneider began as portfolio manager, after Schneider became a Wellington partner.  (Wellington Facts ¶ 13; Tynan Aff. ¶ 5, Ex. C.)  RJR

4

provides evidence suggesting that it selected Schneider as its portfolio manager, and he took over the position, in 1991, before he became a Wellington partner. (Clarke Aff., Ex. D at 70; MacMurray Aff. ¶ 15.) While Ryan's investment efforts for RJR continued after Nyheim's resignation, Schneider played the lead role as RJR's investment manager. (Ryan Aff. ¶ 16.) RJR characterized Schneider's performance as an investment manager as "outstanding." (Mem. of Law in Supp. of Mot. for Summ. J. ("Wellington Mem. I") at 3; RJR Mem. I at 5.)

Wellington did not inform RJR about the non-competition agreement when Schneider became a partner in 1992. (RJR mem. I. at 7.) RJR asserts that if Wellington had informed it about the non-competition agreement in 1987 or at any time thereafter, it would have attempted to negotiate a waiver of this provision with respect to RJR. (Id.; Shultz Aff. ¶ 8; MacMurray Aff. ¶ 46.) Wellington's managing partners have on occasion granted waivers of the non-competition agreement to departing partners, although they have also on at least one occasion declined to do so when asked. (Blank Aff., Ex. C., ¶¶ 19-20.)

Schneider gave notice to Wellington in July 1996 that he planned to resign effective December 31, 1996. (Wellington Facts ¶ 14.) In August 1996, Wellington informed John MacMurray, the RJR Vice President in charge of the Wellington account, that Schneider would be leaving. (Id., RJR Mem. I at 8.) MacMurray responded that he was disappointed that Schneider would be leaving and that he intended to ask Schneider about his future

5

plans and possibility of his continuing management of the RJR portfolio.  (Wellington Facts ¶ 16; RJR Mem. I at 8.)  Despite MacMurray's comments, Wellington did not inform him about the no-competition agreement.  (Wellington Facts ¶ 17; RJR Mem. I at 8.)

In an August 1996 conversation, Schneider told MacMurray that he would be remaining in the investment management business but that he did have a non-competition agreement with Wellington.  (Wellington Mem. I at 4; Clarke Aff., Ex. C, at 145-46.)  MacMurray then told Schneider he hoped RJR could continue using Schneider's services.  (Wellington Mem. I at 4; Clarke Aff., Ex. B, MacMurray Aff. from McFarland Trial, ¶ 19.)  RJR asserts that, based on industry practice and Wellington's subsequent conduct, MacMurray and other executives did not believe that Wellington would attempt to prevent RJR from moving its portfolio with Schneider.  (RJR Mem. I at 25; Clarke Aff., Ex. C at 145-46; MacMurray Aff., Ex. A to Blank Aff. ¶ 24.)  In September 1996, MacMurray told the RJR Pension Investment Committee of Schneider's impending departure from Wellington and commented that Wellington and Schneider were being "very circumspect" about the situation and that it might be some time before the situation resolved itself.  (Wellington Facts ¶ 20; Clarke Aff., Ex. B, MacMurray Aff. from McFarland Trial, ¶¶ 20-21.)

In the fall of 1996, MacMurray spoke to and met with Wellington partners about Wellington's proposals for successor managers but concluded that Wellington did not have an investment product similar to what Schneider offered and that RJR would be

better off keeping the funds with Schneider. (RJR Mem. I at 8; Wellington Facts ¶ 23.) RJR asserts that MacMurray told partners at Wellington on several occasions in October and November of 1996 that RJR was inclined to stay with Schneider. (RJR Mem. I at 8; MacMurray Aff., Ex. A to Blank Aff. ¶¶ 25, 28; Wellington Facts ¶ 24.) At no time during this period did Wellington advise RJR about the non-competition agreement or its intention to enforce that agreement. (RJR Mem. I at 9; MacMurray Aff. ¶¶ 23, 25, 28; Clarke Aff., Ex. D at 74.) In fact, MacMurray states that in November, after he had conveyed his decision to follow Schneider, John Gooch, a Wellington partner, "made a point of saying that Wellington's number one concern was the best interest of the client, RJR Nabisco." (MacMurray Aff. ¶ 28; Clarke Aff., Ex. D at 74.) In August of 1996, Schneider himself informed MacMurray of the non-competition agreement with Wellington (MacMurray Aff., Ex. A to Blank Aff. ¶ 24.) At the same time, RJR, despite its knowledge of the non-competition agreement, never affirmatively asked Wellington if it planned to enforce that agreement. (Wellington Facts ¶ 21.) Gooch's account of his interaction with MacMurray differs from MacMurray's. He states that MacMurray expressed interest in following Schneider "when the dust settles" but did not say he would definitively do so and was warned by another Wellington partner that "there's going to be some dust." (Gooch Aff.)

During the same time period, Wellington partners exchanged a number of memoranda and other correspondence that shed light on

7

their approach to Schneider's departure and the non-competition

agreement.  In an August 28, 1996 memorandum, Eugene E. Record,

Jr., wrote that a representative of another client had told

Wellington he would be talking to Schneider about transferring

funds to him, and "we did not tell him that [Schneider] would be

violating our partnership agreement in doing that."  (Blank Aff.,

Ex. B. at 1.)

In an October 8, 1996 memorandum, Jonathan M. Payson wrote

that another client, Bell Atlantic, "asked us what we would think

about [Schneider] managing money for them after he left

[Wellington].  We dodged the question ... ."(Id. at 2.)   He

continued:

> I think the answer to Bell Atlantic and to other clients is
> clear: it is your money, and we recognize your right to do
> with it whatever is in your best interest as fiduciaries.
> * What we are talking about is the client's money.  They
>   can do whatever they want to do with it.  We cannot let
>   it appear by our words or our actions that we believe
>   we have any entitlement to the management of the
>   client's money or to a revenue stream resulting from
>   it.
> * ... If our clients were to hire [Schneider] after he
>   leaves, it would presumably be a well-considered,
>   balanced, fiduciary decision.
> ...
> I think our message to [Bell Atlantic] and other clients is
> twofold; 1) We want to retain this important and
> longstanding relationship ..., and 2) what they do with
> their other managers, and who those mangers might be is not
> our business and we don't intend to get involved in it or be
> an obstacle to it.
>
> I believe [Bell Atlantic] might consider giving Arnie a
> small sum of money to manage ... . They might retain us as
> well, possible funding [Schneider] from the assets we manage
> or form another source.  To me, that would be fine.
>
> ... The non-compete clause probably has some harrassment
> [sic] value, but it is a no-win situation if it ends up

harrassing [sic] former clients (who are, in fact, some of
our best prospects).

Id. (emphasis in original).  Finally, in an October 11, 1996
email, John Ryan suggested excluding clients likely to leave
Wellington and follow Schneider from certain promising
investments.  (Id. at 3.)

Wellington removed Schneider from the partnership on
December 5, 1996, and brought suit against him in Massachusetts
Superior Court on December 13, seeking to enjoin him from
providing investment advice to current former Wellington clients.
(Wellington Facts ¶ 25; RJR Mem. I at 10.)  Wellington informed
MacMurray by December 17 that Wellington intended to enforce the
non-compete agreement and prevent RJR from following Schneider to
his new firm.  (Wellington Facts ¶ 25; RJR Mem. I at 10;
MacMurray Aff., Ex. A to Blank Aff. ¶¶ 30, 34-35.)  RJR took
action on December 19 to transfer its portfolio from Wellington
to Schneider's new firm and signed an investment management
agreement with Schneider Capital Management on December 20, 1996.
(RJR Mem. I at 10; Wellington Facts ¶ 26.)

### B. Related Cases

In Wellington's Massachusetts state court case, McFarland v.
Schneider, Middlesex Superior Court Civil Action No. 96-7097, the
court quickly granted a preliminary injunction prohibiting
Schneider from soliciting or accepting business from Wellington
clients but permitting him to manage funds for RJR and two other
clients, Utah State Retirement Board and Frank Russell Co., who

9

had already signed agreements with him.  (Wellington Facts ¶ 28.)
The case went to trial before Judge McHugh in March 1997 on
Wellington's claim for a permanent injunction.  After the trial,
Judge McHugh issued a detailed set of findings of fact and
conclusions of law and granted a permanent injunction barring
Schneider from providing services to RJR, the two other contested
clients, and any other current or former Wellington client until
July 2001.  McFarland v. Schneider, 1998 WL 136133 (Mass. Super.
Ct. Feb. 17, 1998).  The injunction went into effect April 18,
1998, although, as explained below, Schneider continued to manage
funds for RJR until September 1998.  Schneider's motion to stay
the judgment pending appeal was denied, and an appeal was filed
to the Massachusetts Court of Appeals.  (Wellington Facts ¶ 32;
RJR Mem. I at 11.)  The parties subsequently settled the case.

One of the former Wellington clients that had signed an
agreement with Schneider, the Utah State Retirement Board
("Utah"), obtained a temporary restraining order from a Utah
state court precluding enforcement of the non-competition
agreement against it.  (RJR Mem. I at 11; Blank Aff., Ex. E.)
Wellington then removed the case to federal court, and the
District Court for the District of Utah refused to grant a
preliminary injunction because Utah had not shown that it was
damaged by Wellington's alleged misrepresentations.  (RJR Mem. I
at 12; Blank Aff., Ex. F, Utah State Retirement Board and Office
v. Wellington Management Co., Civ. No. 2:98-CV-231C (D. Utah,
Apr. 24, 1998).)  An appeal to the Tenth Circuit was filed.  (RJR

10

Mem. I at 12; Blank Aff., Ex. I ¶ 11.) The parties subsequently settled that case.

A second former Wellington client that had signed an agreement with Schneider, Frank Russell Co., sued Wellington in the Eastern District of Pennsylvania and requested a preliminary injunction prohibiting enforcement of the non-competition agreement against it. The district court granted the injunction, finding a "virtual certainty" of success on the merits, <u>Frank Russell Co. v. Wellington Management Co.</u>, 1998 WL_195935, at *1 (E.D. Pa. Apr. 13, 1998), but the Third Circuit reversed the decision, finding that the non-competition agreement was not material, Wellington had no duty to disclose it, and Frank Russell Co. had no likelihood of success in showing that Wellington had violated ERISA or other laws at issue. <u>Frank Russell Co. v. Wellington Management Co.</u>, 154 F.3d 97 (3d Cir. 1998).

### C. Procedural History

Wellington brought an action for declaratory judgment in this court on May 15, 1998, seeking a declaration that RJR may not enjoin or interfere with the Massachusetts Superior Court's permanent injunction barring Schneider from managing assets for RJR and that RJR is not entitled to damages resulting from enforcement of that injunction. (Compl. at 7.)

Wellington agreed with RJR that it would give three weeks notice before seeking contempt sanctions against Schneider for continuing to manage funds for RJR. It gave that notice on

11

September 2, 1998. (Wellington Mem. I at 7.)  The next day, RJR
brought suit against Wellington in the Southern District of New
York, asserting the claims that eventually became the vast
majority of RJR's counterclaims in this suit and asking for a
preliminary injunction prohibiting Wellington from enforcing the
non-competition agreement.  (Gross Aff., Ex. J.)  That court
denied the injunction, citing a failure to show irreparable harm,
and subsequently transferred the case to this court, where it was
consolidated with Wellington's action as Civil Action No. 98-
12184-DPW.  (RJR Mem. I at 13; Wellington Mem. I at 7.)  RJR
filed its counterclaim in this action on October 21, 1998,
corresponding to the claims it had filed in New York except for
the addition of a Mass. Gen. Laws ch. 93A claim.  Wellington then
filed its own counterclaim.

    RJR's claims are for breach of fiduciary duty of loyalty
under the Employee Retirement Income Security Act (ERISA) (Count
I), breach of fiduciary duty to disclose under ERISA (Count II),
prohibited transactions under ERISA (Count III) estoppel (Count
IV), breach of contract (Count V), breach of the implied covenant
of good faith and fair dealing (Count VI), common law breach of
fiduciary duty of loyalty (Count VII), common law breach of
fiduciary duty to disclose (Count VIII), fraud (Count IX),
negligent misrepresentation (Count X), and violation of Mass.
Gen. Laws ch. 93A (Count XI).  (RJR's Answer & Countercl. ¶¶ 48-
112.)  Wellington, in addition to the declaratory judgment
requests above, has submitted claims for aiding and abetting

12

breach of fiduciary duty (Count I), restitution (Count II), and
tortious interference with contract (Count III).  (Wellington's
Answer & Countercl. ¶¶ 29-38.)  Wellington has now moved for
summary judgment on its declaratory judgment claims and on all of
RJR's claims.  RJR has moved for summary judgment on all of
Wellington's counterclaims.  Finally, Wellington has moved to
strike the affidavit of Robert Shultz.  I will begin with the
motion to strike, because its resolution may affect my analysis
of the summary judgment motions.

## II. MOTION TO STRIKE

In ruling upon a summary judgment motion, I may consider
only admissible evidence.  See, e.g., Garside v. Osco Drug, Inc.,
895 F.2d 46, 49 (1st Cir. 1990).  Evidence which is irrelevant to
consideration of the issues before me is not admissible.  See
Fed. R. Evid. 402.  At issue in the motion to strike is the
relevance of Shultz' observations about the contract between RJR
and Wellington.

In interpreting a contract, a court must give effect to the
parties' intentions as manifested in the language of the
contract.  See, e.g., Shea v. Bay State Gas Co., 383 Mass. 218,
224-25 (1981).  When the language is unambiguous, the court must
enforce that language as written, but if the language is
ambiguous, a fact finder may look to outside evidence to
determine the intentions of a party.  See, e.g., Fairfield 274-
278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992).
However, a party's subsequent statements as to what its

13

intentions were with specific contract language, when those
intentions were never externally expressed, are not relevant to a
fact finder's determination of the meaning of a contract. As
Judge Learned Hand wrote many years ago, "It makes not the least
difference whether a promisor actually intends the meaning which
the law will impose upon his words. ... Hence it follows that no
declaration of the promisor as to his meaning when he used the
words is of the slightest relevancy." Eustis Mining Co. v. Beer,
Sondheimer & Co., 239 F. 976, 984 (S.D.N.Y. 1917). See also
Pahlavi v. Palandjian, 809 F.2d 938, 945 (1st Cir. 1987)
("[C]ontracting parties are bound by objective manifestations and
expression, not subjective expectations.").

In paragraphs 4, 5, and 6 of his affidavit, Robert Shultz,
former Vice President of RJR, sets out the "rationale,"
"purpose," and "intent" of specific clauses within the Investment
Management Agreement ("IMA") between RJR and Wellington. He does
not support these assertions with accounts of statements made by
RJR officials either to each other or to Wellington officials
setting out the posited purposes for the clauses in question.
Rather, he appears simply to be expressing his current,
subjective opinion as to what he intended when he negotiated the
IMA. As the above cases indicate, the law has long been clear
that subjective statements of intent are not relevant to contract
interpretation.

RJR attempts to distinguish the above-cited cases and argue
for the admissibility of statement of subjective intent as

14

extrinsic evidence to aid the interpretation of an ambiguous
agreement primarily based on Judge Saris' opinion in <u>Baladevon,</u>
<u>Inc. v. Abbott Lab., Inc.</u>, 871 F. Supp. 89 (D. Mass. 1994).  In
that case, Judge Saris does in fact consider the statements of
representatives of both parties as to their "contemporaneous
understanding" of, and thus their subjective intent toward, the
contract clause in question.  <u>Id.</u> at 97-99.  However, in that
case, the court admitted the statements precisely because they
came from both parties and because they showed that both parties
had the same understanding, thus invoking the contract principle
that "[w]here the parties have attached the same meaning to a
promise or agreement or a term thereof, it is interpreted in
accordance with that meaning."  <u>Id.</u> at 98 (quoting <u>Restatement</u>
<u>(Second) of Contracts</u> § 201(1)).  Judge Saris distinguished the
"slew of First Circuit opinions" which emphasize that contracts
depend on objective manifestations of intent rather than
uncommunicated subjective expectations because "none of these
cases involves the situation where there is consonant evidence of
both contracting parties' intent."  <u>Id.</u>

The case before me fits the rule, not the exception
identified by Judge Saris.  Here, Wellington has not introduced
any statements about its "contemporaneous understanding" or
subjective intent as to the disputed contract clauses, and any
interpretations Wellington has offered have been contrary to, not
consonant with, those that Shultz presents.  RJR's attempt to
read contract interpretations consistent with Shultz' into

15

Wellington documents produced long after the IMA was drafted and
which do not even address the contract with RJR is to no avail.
As Judge Saris noted, "evidence of the contemporaneous
understanding of [one party], standing alone, would be
unpersuasive." Id. at 99. The longstanding rule that statements
of subjective intent are not relevant applies here.

Therefore, I will strike as irrelevant the portions of the
Shultz affidavit containing subjective explanations of intent:
the third and fourth sentences of ¶ 4; the first, second, and
fifth sentences of ¶ 5; the second, third, and forth sentences of
¶ 6. The remainder of the affidavit contains statements which
may be relevant to determining, among other things, the
relationship between RJR and Wellington at the time the IMA was
signed and the importance of any omission of material information
by Wellington and, therefore, is admissible as evidence. As a
result, I will consider the remainder of Shultz's affidavit in
deciding the summary judgment motions.

### III. SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). A material fact is one which has the "potential to affect
the outcome of the suit under applicable law." Sanchez v.
Alvarado, 101 F.3d 223, 227 (1st Cir. 1996). A genuine issue is

16

"one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994) (internal quotations and citations omitted). Because the parties have filed cross-motions for summary judgment, I must evaluate each motion separately, being careful to draw inferences against each movant in turn. El Dia, Inc. v. Colon, 963 F.2d 488, 492 91st Cir. 1992).

## A. Wellington's Motion for Summary Judgment

Wellington seeks to have me resolve through summary judgment its request for a declaration that RJR is not entitled to damages resulting from the Superior Court's injunction and for an adjudication of the rights and liabilities of the parties in respect of the several RJR claims. In considering Wellington's motion for summary judgment, I will focus on RJR's claims--rather than explicitly on the declaratory judgment action--an approach

17

both parties have taken in their memoranda.

## 1. ERISA Claims

### a. Breach of Fiduciary Duty of Loyalty (Count I)

The IMA between RJR and Wellington names Wellington as an
ERISA fiduciary.  (IMA, Ex. A to RJR Mem. I ¶ 10.)  Under ERISA,

> a fiduciary shall discharge his duties with respect to a
> plan solely in the interest of the participants and
> beneficiaries and
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their
> beneficiaries; and
> (ii) defraying reasonable expenses of administering the
> plan;
> (B) with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in
> like capacity and familiar with such matters would use in
> the conduct of an enterprise of a like character and with
> like aims.

29 U.S.C. § 1104 (" § 404").  RJR alleges that Wellington
violated its fiduciary duty of loyalty by failing to tell RJR of
the existence of the non-competition agreement among its partners
when the IMA was drafted in 1987, when Wellington amended the
non-competition agreement in 1990, or when Schneider was made a
partner in 1992.  RJR argues that Wellington further breached its
fiduciary duty after it learned of Schneider's decision to leave
by failing to tell RJR either that the non-competition agreement
existed or that Wellington planned to enforce it, by
affirmatively misrepresenting that Wellington would not enforce
the agreement, and then by taking action to enforce it.

The Third Circuit in <u>Frank Russell Co. v. Wellington
Management Co.</u>, 154 F.3d 97 (3d Cir. 1998), found that another of

18

Wellington's former clients, similarly situated, had no likelihood of success on this and other ERISA claims. Id. at 105. Specifically, the Third Circuit wrote that § 404 only created fiduciary obligations for actions taken "with respect to a plan" covered by ERISA, but not for a "decision which is 'strictly a corporate management business decision.'" Id. at 103-04 (citations omitted). The court found that Wellington's noncompetition agreement "was an internal business matter," such that Wellington was not obligated to tell a client about it upon the signing of a management agreement and was entitled to enforce it without violating the duty of loyalty. Id. at 104. The Third Circuit's logic is extremely helpful but does not dispose of the parallel claim before me. While the court in Russell dealt only with the non-compete itself, Wellington's duty to disclose it at the start of the client relationship, and Wellington's decision to enforce it, RJR references later instances of non-disclosure and alleged misrepresentation. As a result, I must analyze this claim from the beginning.

ERISA requires a trustee or other fiduciary to administer a plan "solely in the interest of the participants and beneficiaries" of the plan. § 404(a)(1). The ERISA fiduciary duty includes the common law duty of loyalty, which requires fiduciaries to deal fairly and honestly with beneficiaries. See Varity v. Howe, 116 S. Ct. 1065, 1075 (1996). However, "fiduciary status is not an all or nothing proposition." Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 18 (1st Cir.

19

1998).  ERISA fiduciaries wear "two hats"--they have fiduciary responsibilities to administer or manage their beneficiaries' plan, but they also have their own, independent business responsibilities.  Vartanian v. Monsanto Co., 131 F.3d 264, 268 (1st Cir. 1997).  "'[W]hen acting on behalf of the pension fund, there is no doubt that [the fiduciary] must act solely to benefit participants and beneficiaries. However, ... the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior.'" Id. (quoting Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 567 F. Supp. 1184, 1201 (N.D.W.Va. 1983), aff'd 724 F.2d 406 (4th Cir. 1983), cert. denied, 467 U.S. 1205 (1984)).

The delineation of responsibilities between these two roles in practice is far from clear cut.  As the Third Circuit has held in other litigation, while a fiduciary does not have "an obligation to disclose all details of its personnel decisions that may somehow impact upon the course of dealings with a beneficiary/client," the fiduciary must disclose "those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection." Ream v. Frey, 107 F.3d 147, 155 (3d Cir. 1997) (quoting Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Secs., Inc., 93 F.3d 1171, 1182 (3d Cir. 1996)).  Similarly, one district court held that an investment firm violated its fiduciary duty by concealing a family connection between one of its employees working on the fund in question and a trustee of

20

the fund.  <u>International Bhd. of Painters & Allied Trades Union & Indus. Pension Fund v. Duval</u>, 925 F. Supp. 815, 821-24 (D.D.C. 1996).  The court commented that § 404 imposed a duty "not limited to investment management decisions."  <u>Id.</u> at 823.  RJR argues that Wellington concealed material facts violating its fiduciary duty, as had the defendants in <u>Ream</u> and <u>Duval</u>, rather than merely making independent business decisions.

Furthermore, even when a fiduciary makes business decisions not covered by ERISA, it has a duty to carry out those decisions in ways that will not be harmful to its beneficiaries.  For instance, as Judge Saris has noted, while fiduciary duties do not govern a fiduciary's decision to terminate an ERISA plan, plan trustees may violate fiduciary duties in the manner in which they implement that decision.  <u>Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund</u>, 933 F. Supp. 1124, 1143 (D. Mass. 1996).  <u>See also</u> <u>Waller v. Blue Cross of California</u>, 32 F.3d 1337, 1342 (9th Cir. 1994) (holding that fiduciary duties do apply to implementation of decision to terminate even though not to the decision itself).  Similarly, here, while fiduciary duties do not apply to Wellington's business decision to establish a non-competition agreement and to enforce that agreement, they may apply to the way in which Wellington carried out those decisions.

I find the Third Circuit's holding in <u>Russell</u> to be persuasive as to Wellington's initial implementation of the non-competition agreement.  Wellington made a business decision unrelated to its fiduciary responsibility and cannot have

21

violated fiduciary duties in doing so. Similarly, Wellington did
not violate its duty of loyalty in failing to disclose this
personnel decision to RJR before the signing of the IMA.
Although <u>Russell</u> did not address circumstances such as
Wellington's subsequent failure to disclose the non-compete when
it was amended or when Schneider became a partner, the same logic
applies.  These changes were also business decisions not
resulting in material information which Wellington had to
disclose.

However, when Schneider announced his intention to leave and
RJR indicated that it was likely to follow, the existence of the
non-compete and Wellington's intention to use it may indeed have
become material facts which RJR, as the beneficiary, needed to
know for its protection.  RJR has introduced evidence suggesting
that, while Schneider told RJR of the existence of the agreement,
RJR did not think that Wellington would enforce it.  (Clarke
Aff., Ex. C at 145-46; MacMurray Aff., Ex. A to Blank., ¶ 24.)
It has produced further evidence, in MacMurray's statement and in
Wellington's own internal memoranda, that may support RJR's
allegation that Wellington purposely failed to alert RJR about
its intention to enforce the non-compete and even misrepresented
that it would not do so by saying, in direct response to
MacMurray's statement in November that RJR was likely to follow
Schneider, that RJR's interests were Wellington's top priority.
(Blank Aff., Ex. B; MacMurray Aff ¶ 28; Clarke Aff., Ex. D at
74.)

22

In any event, evidence of record establishes that Wellington did in fact notify RJR on December 16 that it "was seeking injunctive relief to keep Schneider from accepting any Wellington clients" and (MacMurray Aff., Ex. A to Blank Aff. ¶¶ 34 & 35) intended to enforce the non-compete agreement to prevent RJR from following Schneider to his new firm. (Id. ¶ 35.) On December 19, at least two days after RJR was notified of Wellington's intent to enforce the non-compete agreement, RJR decided to transfer its portfolio from Wellington to Schneider's new firm. (Id. ¶ 36.) Wellington's duty of loyalty to RJR was satisfied when Wellington gave RJR definitive advice regarding its intentions with respect to Schneider. When RJR made its own decision to leave Wellington it was fully aware of Wellington's intent to enforce the non-compete agreement. The ERISA duty of loyalty required no more in this context. Accordingly, I will grant Wellington's motion for summary judgment on Count I.

b. Breach of Fiduciary Duty to Disclose (Count II)

RJR, in an overlapping claim, asserts that Wellington breached its fiduciary duty to disclose material information when it failed to disclose the existence of the non-competition agreement during all stages of the parties between interactions and in its unilateral determination to enforce the agreement in 1996. The Russell court rejected a parallel claim, finding that the existence of the non-competition agreement was not material information which the beneficiary needed to know. Russell, 154 F.3d at 104. The Third Circuit stated that Wellington did not

23

need to reveal all aspects of its internal structure, but rather only needed to disclose information which, at the time, it reasonably believed the client needed to know for its own protection. Id.  The Court reasoned that, because Wellington had a contractual right to terminate its relationship with Russell for any reason on 30 days notice, it did not need to inform Russell of the abstract possibility of causing the same transaction costs by terminating the relationship through the more "circuitous route" of terminating a partner and then enforcing the non-compete.  Id. at 105.  Once again, however, the Third Circuit dealt only with the initial non-disclosure at the time the investment management agreement with Russell was signed.

As the Russell court makes clear, a fiduciary has a duty only to disclose facts which are material and which the beneficiary must know for its own protection.  Id. at 4.  See also Beddall, 137 F.3d at 22; Glaziers, 93 F.3d at 1182.  A plan fiduciary can violate this duty either by affirmatively misleading plan participants about the operation of a plan, or by remaining silent in circumstances where silence could be considered misleading.  Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 991 (7th Cir.1993); see also Bixler, 12 F.3d at 1300 (stating fiduciaries have a duty to inform which "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful").  The fiduciary has a duty to disclose to the beneficiary, however, only those material facts known to the

fiduciary but unknown to the beneficiary, which the beneficiary
must know for its own protection." Glaziers, 93 F.3d at 1182;
see also Bixler, 12 F.3d at 1300 ("[T]he duty to disclose
material information 'is the core of a fiduciary's
responsibility.' ") (quoting Eddy v. Colonial Life Ins. Co. of
America, 919 F.2d 747, 750 (D.C. Cir.1990)).

A misrepresentation rises to a material level, for example,
if "there is a substantial likelihood that it would mislead a
reasonable employee in making an adequately informed retirement
decision." In re Unisys, 57 F.3d 1255, 1264 (3rd Cir. 1995).[1]
The Third Circuit's logic in Russell is persuasive as to
Wellington's initial non-disclosure of the non-competition
agreement. As in Russell, the IMA between Wellington and RJR
permits either party to terminate the agreement with 30 days
notice, thus forcing RJR--if Wellington chose unilaterally to
terminate--predictably to incur the potential transaction costs

---

[1]Similar tests for materiality have been adopted in other
contexts. A representation is material for purposes of the
Immigration and Nationality Act if it "had a natural tendency to
influence the decisions of ..." a party. Kungys v. United
States, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839
(1988). Also an omitted fact is material for purposes of the
securities law "if its disclosure would alter the 'total mix' of
facts available to the investor and 'if there is a substantial
likelihood that a reasonable shareholder would consider it
important' to the investment decisions." Cooperman v.
Individual, Inc. 171 F.3d 43, 49 (1st Cir. 1999) (quoting Basic
Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d
194 (1988)). Black's Law Dictionary defines a "Material
representation" as something that "relates to a matter upon which
plaintiff could be expected to rely in determining to engage in
the conduct in question." Black's Law Dictionary at 977 (6th
ed.1990).

associated with a change in investment manager, notably the costs
of liquidating the investments made by that manager and the loss
of that manager's talents.  (See IMA, Ex. A to RJR Mem. I ¶ 16;
RJR's Answer and Countercl. ¶¶ 44, 45.)  The more specific
possibility that termination would effectively arise when a
Wellington partner would depart, RJR chose to follow the partner,
and Wellington chose to enforce the non-competition agreement,
would not have appeared, at the time the IMA was signed, to be
additional information RJR needed to know for its protection, in
light of the IMA's flexible termination clause.  This information
was no more material when the non-compete clause was amended in
1990 or when Schneider was made a partner in 1992, regardless of
whether or not he was already investment manager for RJR at the
time.  RJR's only evidence suggesting that the existence of the
non-compete was material is its own executive's assertion that he
would have found the information important and would have acted
upon it.  (Shultz Aff. ¶ 8.)  However, the fact that an RJR
official asserts he would have found the information "important"
and ideally would have preferred to have had it does not mean
that it rises to the level of material information which RJR
needed to know for its own protection.  I find that Wellington
did not violate its fiduciary duty to disclose material
information prior to August 1996.

The period between August and December 1996 presents a
somewhat different situation.  With Schneider planning to leave
Wellington and RJR expressing its interest in following him, the

non-competition agreement presented more than an unlikely,
abstract possibility of disruption for RJR's pension plans
arising from the IMA's flexible termination clause.  At that
point, the existence of the non-compete and Wellington's
intention to enforce it became information that RJR needed to
know for the short term protection of its plans.  RJR may not
maintain an action for Wellington's failure to disclose the
**existence** of the non-compete during this time, however, because
Schneider had told RJR about the agreement, thereby eliminating
RJR's need to learn of it directly from Wellington.  Information
that Wellington was considering whether to **enforce** the agreement,
while material to RJR's decision about whether to follow
Schneider or whether to press Wellington to negotiate a waiver or
some other type of compromise, was similarly available to RJR,
albeit in a constrained time fame.  MacMurray's affidavit clearly
establishes that RJR did in fact have information about
Wellington's enforcement intentions before it made the decision
to follow Schneider to his new firm. (MacMurray Aff., Ex. A to
Blank Aff. ¶ 34.)

RJR may have been denied the strategic benefit before
December 17 of knowing whether to press vigorously for a
compromise, but that opportunity was made available to it no
later than receipt of the information of Wellington's intentions.
Moreover, the issue of enforcement was--if not fully famed--
certainly part of the RJR mix of information well before December
17.  RJR, in any event, received disclosure about enforcement

27

before it terminated its relationship with Wellington and signed with Schneider.

I find that Wellington did not violate its fiduciary duty to disclose material information.  Therefore, I will grant Wellington's motion for summary judgment on Count II.

c. Prohibited Transaction (Count III)

RJR argues that, in 29 U.S.C. § 1106(a)'(1)(C), ERISA prohibits transactions which are not "reasonable" under 29 U.S.C. § 1108(b)(2).  The regulation corresponding to that section states, "No contract or arrangement is reasonable within the meaning of section 408(b)(2) of the Act and § 2550.408b-2(a)(2) if it does not permit termination of the plan without penalty ... to prevent the plan from becoming locked into an arrangement that has become disadvantageous."  29 C.F.R. § 2550.408b-2(c).  RJR asserts that, by enforcing the non-competition agreement with Schneider against RJR, Wellington has inserted a penalty for termination into the IMA, therefore rendering that original contract a prohibited transaction.  (RJR's Answer and Countercl. ¶¶ 62-69.)

The Third Circuit rejected the identical claim in Russell, finding first that Schneider, by violating the non-compete, was more responsible for any penalty to the client than Wellington was in enforcing it.  Russell, 154 F.3d at 105.  The Third Circuit further found that the transaction costs ensuing to the client as a result of Wellington's enforcement of the non-compete did not constitute a "penalty" under ERISA.  Id.  The transaction

28

costs were not a sum charged by Wellington, and indeed did not go
to Wellington at all, as a penalty would have.  Furthermore, the
Third Circuit reasoned, the client would have expended the
transaction costs whether it stayed with Wellington or not,
because a new Wellington advisor presumably would have had to
sell off the holdings Schneider managed and buy new ones just as
any other new advisor would.  Therefore, since the consequences
of staying or leaving were no different, Russell was not "locked"
into doing business with Wellington, as is required for a
"penalty" under ERISA.  Id.

The Third Circuit's reasoning in Russell is persuasive here
as well.  There are no distinctions between the claim before me
and the one rejected in Russell, and RJR has not even attempted
to defend this claim in its memorandum.  The regulation and the
case law clearly contemplate contracts which result in te
beneficiary being "locked in" to an adverse situation.  Id..; 29
C.F.R. § 2550.408b-2(c); International Union of Bricklayers &
Allied Craftsmen v. Gallante, 912 F. Supp. 695, 704 (S.D.N.Y.
1996) ("[T]he expressed goal of the regulation ... is to prevent
a fund from being locked into an arrangement that is no longer
beneficial to the fund.")  The IMA was not such a contract and
was therefore not a prohibited transaction under ERISA.  I will
grant Wellington's motion for summary judgment as to Count III.
d. Estoppel (Count IV)

Congress and the Supreme Court have authorized courts to
establish a body of federal common law to fill in the gaps in

ERISA and in particular to set up "additional 'appropriate
equitable relief.'" <u>Massachusetts Mut. Life Ins. Co. v. Russell</u>,
473 U.S. 134, 156 (1985) (citation omitted).  One such additional
form of equitable relief is equitable estoppel.  The First
Circuit has set out the elements of a claim for estoppel under
ERISA: "(1) a representation of fact made to the plaintiff; (2) a
rightful reliance thereon; and (3) injury or damage to plaintiff
resulting from a denial of benefits by the party making the
representation."  <u>Cleary v. Graphic Communications Int'l Union
Supplemental Retirement & Disability Fund</u>, 841 F.2d 4444, 447
(1st Cir. 1988).

        The First Circuit has written that, to establish common law
estoppel, a plaintiff must show that the defendant made "a
definite misrepresentation of fact to another person having
reason to believe that the other will rely upon it."  <u>Law v.
Ernst & Young</u>, 956 F.2d 364, 368 (1st Cir. 1992) (citation
omitted).  RJR contends that an omission can be enough to fulfill
the first requirement of estoppel, arguing that the First Circuit
has not explicitly held otherwise, and some courts have so found.
<u>See</u> <u>Katz v. Colonial Life Ins. Co. of Am.</u>, 951 F. Supp. 36, 41
(S.D.N.Y. 1997) ("[S]ilence may act as a 'representation' for
purposes of estoppel ... when one has a duty to speak or one
knows that the other party was acting under a mistaken belief.").
I need not resolve this issue.  Here, RJR alleges an affirmative
misstatement to frame its claim.  Specifically, MacMurray states
that after he told John Gooch, a Wellington partner, that RJR

30

intended to follow Schneider, "Gooch made a point of saying that Wellington's number one concern was the best interest of the client, RJR Nabisco."  (MacMurray Aff., Ex. A to Blank Aff., ¶ 28.)  RJR asserts that Gooch effectively told RJR with this statement that Wellington would permit RJR to keep its funds with Schneider.

Wellington argues that the statement Gooch allegedly made is too vague to constitute an affirmative misrepresentation. Wellington points to <u>City of Hope Nat'l Med. Ctr. v. Healthplus, Inc.</u>, 156 F.3d 223 (1st Cir. 1998), in which the plaintiff hospital asserted that an insurer's statement to the plaintiff that the patient in question "has some responsibilities to follow so she can have services coverage" constituted a misstatement entitling the hospital to estoppel when the insurer denied coverage.  <u>Id.</u> at 229.  The First Circuit found that "a statement emphasizing the procedural requirements of a health insurance plan is far from the 'definite misrepresentation of fact' about a willingness to pay for medical services necessary to establish an estoppel claim."  <u>Id.</u> at 230.

Whether a statement vague on its face is in fact a misrepresentation is a very fact-specific inquiry.  As one court observed, "[t]he remark is not to be looked at in isolation but in the context of the whole situation."  <u>Sheehy v. Lipton Indus., Inc.</u>, 24 Mass.  App. Ct. 188, 192 (1987), <u>review denied</u>, 400 mass. 1103 (1987) (finding that a broker's answer of "Don't worry about it" could constitute misrepresentation).  <u>See also</u> <u>Varity</u>

31

Corp. v. Howe, 116 U.S. 1065, 1072-05 (1986) (general statement
that plan had a "bright future" contributed to a finding that
fiduciary misled beneficiaries in violation of fiduciary duties).
In the context in which Gooch's statement was allegedly made, it
was not at all vague. MacMurray had, by his account, just told
Gooch that RJR would leave Wellington to follow Schneider.
Gooch's subsequent assurance that RJR's best interest was
Wellington's "number one concern," if accurate, conveyed more-
than-tacit permission from Wellington for RJR to proceed as it
wished.

But Gooch's statement was not the final statement from
Wellington. However tardy Wellington may have been in finally
communicating to RJR that it intended to enforce the non-compete
agreement, Wellington did in fact deliver this information before
RJR took any action in detrimental reliance on Gooch's earlier
statement. This communication to RJR vitiates any previous
misrepresentation made by Wellington to RJR. Therefore, I will
grant Wellington's motion for summary judgment on Count IV.

## 2.   NON-ERISA CLAIMS

### a.   ERISA Preemption

Wellington asserts that ERISA preempts most of RJR's
remaining claims. I will discuss preemption under ERISA in
general before moving on to the individual claims.

ERISA's preemption provision provides that, with exceptions
not relevant to this case, "the provisions of this subchapter and
subchapter III of this chapter shall supersede any and all State

laws insofar as they may now or hereafter relate to any employee
benefit plan described in section 1003(a) of this title and not
exempt under section 1003(b) of this title." 29 U.S.C. § 1144.
The Supreme Court observed, "The pre-emption clause is
conspicuous for its breadth.  It establishes as an area of
exclusive federal concern the subject of every state law that
'relate[s] to' an employee benefit plan governed by ERISA."  FMC
Corp. v. Holliday, 498 U.S. 52, 58 (199)).  Preemption applies to
any state laws that relate to ERISA plans in the case at hand,
rather than to only those that specifically address employee
benefit plans. Id.  ERISA preemption is not unlimited, however.
ERISA does not preempt "if the state law has only a 'tenuous,
remote, or peripheral' connection with covered plans, ... as is
the case with many laws of general applicability." District of
Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 130
n.1 (1992) (citation omitted).  Nonetheless, the Supreme Court
has held that ERISA may preempt common law claims, including
state breach of contract, breach of fiduciary duties, and fraud
claims.  See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48
(1987).  See also Cuoco v. Nynex, Inc., 772 F. Supp. 884, 886-87
(D. Mass. 1989) ("[C]ommon law claims are preempted only if the
relationship between the plaintiff and the defendant is based on
a plan governed by ERISA.").

I have found that ERISA does apply to the conduct alleged in
RJR's claims.  It is clear, then that any state statutory or
common law claims based on Wellington's conduct as an ERISA

fiduciary must be preempted.  Indeed, RJR only argues that its
state statutory and common law claims are not preempted for
"Wellington conduct that is outside its role as an ERISA
fiduciary."  (RJR Mem. I at 46.)  Nevertheless, as will appear
below, I find all of RJR's non-ERISA claims to be preempted by
ERISA and thus only the straight breach of contract claim,
construed as a matter of federal common law, can survive.

b. Breach of Contract Claims

i. Express Breach (Count V)

RJR contends in Count V that Wellington breached several
express provisions of the IMA between the two parties.  I must
address the contract claims as a matter of federal law, informed
to be sure by relevant principles of Massachusetts contract law.[2]
First, ¶ 10 of the IMA states, "The Manager shall carry out its
responsibilities under this Agreement in accordance with the

---

[2]A contract under ERISA is to be interpreted under
principles of federal common law.  See Bellino v. Schlumberger
Techs., Inc., 944 F.2d 26, 29 (1st Cir. 1991).  The First Circuit
has incorporated state law principles into its federal common law
of contract interpretation.  See Rodriguez-Abreu v. Chase
Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993).
Although the IMA designates Georgia law to govern disputes, I am
satisfied Massachusetts courts would not apply Georgia law
because Georgia has no substantial relation to the contract.  See
Dykes v. Depuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998).  Instead,
Massachusetts courts would apply Massachusetts law because this
state has the strongest connections to the contract.  Indeed, the
parties both agree upon the use of Massachusetts law.
Furthermore, both parties take the position that there is no
difference among the possible state laws (or the federal common
law) in their treatment of the issues in question in this case.
Where different jurisdictions have the same rules of law in
regard to a case, the case will be decided according to the law
common to the jurisdictions in question.  See Boston Hides &
Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, 1159 (D.
Mass. 1994).

standards of conduct applicable to it as a fiduciary under ERISA." (IMA, Ex. A to RJR Mem. I ¶ 10.) RJR's claims under this paragraph are completely subsumed by its claims under ERISA itself. As a result, summary judgment is appropriate as to a breach of ¶ 10.

### (A) Paragraph 8 provides:

The Manager shall promptly notify the Chief Financial Officer if any substantial change in the duties of any or all of the following individuals is either contemplated or effected:

> Mr. John A. Nyheim
> Partner & Senior Vice President
>
> Mr. John R. Ryan
> Partner & Senior Vice President

(Id. ¶ 8.) RJR argues that this passage in fact obligated Wellington to notify RJR about a change in duties of whoever was the investment manager of RJR's assets at a given time and, thus, that Wellington breached the agreement by failing to notify RJR of the non-competition agreement when Schneider became a partner in 1992. RJR argues that it intended ¶ 8 to refer to whomever the investment manager happened to be and that John Ryan was specifically mentioned because he was likely to be the successor to Nyheim, the investment manager at the time of the agreement.

RJR's argument is undercut by the language of ¶ 8 itself. As the First Circuit has observed, a contract should only be submitted for interpretation by a jury when it is ambiguous, and "where the contract is unambiguous, it is to be enforced according to its terms." Fairfield 274-278 Clarendon Trust v.

Dwek, 970 F.2d 990, 993 (1st Cir. 1992). Paragraph 8 of the IMA
is decidedly unambiguous. It states that Wellington is to notify
RJR of "any substantial change in the duties of any or all of the
following individuals." It then names Nyheim and Ryan.
Therefore, Wellington was obligated by contract to notify RJR of
any substantial change in the duties of Nyheim and Ryan--and no
one else. If RJR wanted this obligation to run to whoever was
managing its funds from Wellington, it could have--and should
have--said so in the contract or some amendment thereto.

RJR cites the common contract principle that a contract is
to be construed to give effect to the intent of the parties and
to the purpose behind the agreement. See Boston & Maine Railroad
v. Hall, 284 F.2d 474, 477 (1st Cir. 1960), cert. denied, 365
U.S. 817 (1961). RJR argues that ¶ 8 should therefore be read
consistent with RJR's intent, rather than according to its own
language. However, intent must be read "as manifested by the
words used," id., and where the words are clear, the inquiry ends
there. As explained above, a party's subsequent assertions as to
what it meant by a contract provision, never expressed at the
time of the agreement and not evident in the agreement itself,
are completely irrelevant. See Eustis Mining Co. v. Beer,
Sondheimer & Co., 239 F. 976, 984 (S.D.N.Y. 1917). Wellington
did not violate ¶ 8 of the IMA and is entitled to summary
judgment on Count V inasmuch as it relates to ¶ 8.

**(B)  Paragraph 16** of the IMA states, "Upon termination of
this Agreement, Manager will take all reasonable actions to

protect and preserve the Portfolio and will transfer the
Portfolio as directed by the Chief Financial Officer."  (IMA, Ex.
A to RJR Mem. I ¶ 16.)  Wellington first argues that it could not
have breached this provision because ¶ 7 of the agreement
prohibits Wellington from taking title to or possession of any
assets in RJR's portfolio, (id. ¶ 7), and Wellington could not
transfer what it did not have.  However, it is an established
principle that courts should avoid an interpretation of a
contract which would render some provisions superfluous.
Restatement (Second) of Contracts § 203(a) & Comment b (1981).
In light of ¶ 7, if I were to read ¶ 16 to say that Wellington is
not to transfer possession of the portfolio, the 'transfer'
clause in ¶ 16 would be entirely meaningless because--under
Wellington's reading--Wellington was prohibited from having
possession of the portfolio.  I will instead read ¶ 16 to provide
what it says, that Wellington is to transfer control or
management of the portfolio as directed by RJR.

     I find that RJR has raised a genuine issue of material fact
as to whether Wellington breached ¶ 16 of the IMA.  It is true,
as Wellington points out, that Wellington did in fact transfer
the RJR portfolio to Schneider upon termination of the IMA, and
Schneider managed it for almost two years.  However, Wellington
sued in December 1996 to enjoin Schneider from managing RJR's
funds, allowing him to do so only while the litigation progressed
(and while its enforcement efforts proceeded after the Superior
Court's ruling).  That Wellington did not immediately stop the

37

transfer to Schneider as directed by RJR does not necessarily mean that Wellington did not breach ¶ 16. Wellington did, upon termination of the IMA, begin a process which led eventually to the defeat of the result clearly intended by ¶ 16--the management of RJR's pension plans by the manager of RJR's choice.

I will deny Wellington's summary judgment motion as to Count V to the extent that it is based upon a breach of ¶ 16.[3]

ii. Implied Covenant of Good Faith and Fair Dealing (Count VI)

Massachusetts courts have found that every contract contains an implied covenant of good faith and fair dealing. <u>Starr v. Fordham</u>, 420 Mass. 178, 184 (1995). The implied covenant "requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Piantes v. Pepperidge Farm, Inc.</u>, 875 F. Supp. 929, 938 (D. Mass. 1995). RJR argues

---

[3]Measuring RJR's damages under this count presents somewhat thorny issues. The IMA gave Wellington the express contractual right to terminate its relationship with RJR, for any reason, on 30-days notice. Wellington, thus, always had the power to impose substantial transaction costs on RJR. On the other hand, enforcement of the non-competition agreement in derogtion of RJR's right under § 16 to have transfer made as 'directed' by RJR may be found to have damages beyond garden variety transaction costs. The non-compete requires that Schneider neither solicit nor accept business from Wellington clients for five years. If RJR prevails on this count, then it may be able to establish damages from the imposition of this five-year moratorium, taking into consideration (and probably excluding) the period of time when Schneider continued to manage the RJR account pending resolution of Wellington's state injunction proceeding. Given the degree of speculation involved in calculating such damages at this stage, I will not resolve at this time Wellington's request for a declaration that RJR is not entitled to damages resulting from the injunction, but leave the issue to further development by the parties.

that Wellington's failure to disclose the non-compete and its
intention to enforce it, as well as Wellington's
misrepresentation and subsequent legal action, violate the
implied covenant of good faith and fair dealing.  Wellington
counters that none of its actions deprived RJR of the benefits of
the contract, because RJR got all the services it paid for and
was injured, if at all, only after the contract was terminated.
Therefore, Wellington contends, the implied covenant does not
apply.

It is by no means clear that the federal common law of
contracts applicable to ERISA contracts would recognize
principles of good faith and fair dealing coincident with those
enunciated by the Massachusetts state courts.[4]  I need not reach

---

[4]Several courts have held that ERISA does preempt state
claims for breach of the covenant of good faith and fair dealing.
See e.g., Tolle v. Carroll Touch, Inc., 977 F. 2d 1129 (7th Cir.
1992), subsq. proceeding, 23 F.3d 174 (7th Cir. 1994) (holding
that allegation that employer violated implied duty of good faith
and fair dealing when it terminated employee was preempted by
ERISA); Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889
(9th Cir. 1990) (stating employee's state law claim against her
employer for breach of express and implied covenant of good faith
and fair dealing, arising when employer denied request to revoke
acceptance of early retirement, was preempted by ERISA and was
further identical to misconduct employee alleged in her ERISA
claims); Ellenburg v. Brockway, Inc., 763 F.2 d 1091 (9th Cir.
1985) (holding that even though fiduciary was sued in capacity as
employer and claim for breach of good faith and fair dealing
seems to concern employment relationship, the claim nevertheless
is directly connected with an employee benefit plan and is
preempted by ERISA).  The strong inference from these cases is
that a state claim for breach of the covenant of good faith and
fair dealing comes within the class of questions on which
Congress intended for federal courts to create federal common
law.  And to date, research has disclosed no federal court that
implied in an ERISA's fiduciary's duties a separate duty of good
faith and fair dealing.

39

that question, however, because it is apparent that the literal terms of the IMA between the parties fully define the terms under which the "fruits' of their agreement will be realized.  The express breach of contract claim in count V captures all the relevant contractual issues in this case and consequently Count VI, even if it can be said to state a claim under the federal common law of contracts, is duplicative of Count V.

c. State Statutory & Common Law Claims

i.  Common Law Breaches of Fiduciary Duty (Counts VII & VIII)

RJR alleges that Wellington breached its common law fiduciary duty of loyalty (Count VII) and its common law fiduciary duty to disclose (Count VIII).  The allegations contained in these counts are the same as those in the corresponding counts alleging breach of fiduciary duty under ERISA.  RJR has not produced any authority to indicate that Massachusetts fiduciary law applies more broadly or to different circumstances than fiduciary duties under ERISA.  Indeed, if Massachusetts fiduciary law were to apply more broadly, it would be preempted.  In any event, the claims of common law breach of fiduciary duty are replicative of the ERISA claims.  Accordingly, I will grant Wellington's motion for summary judgment as to Counts VII and VIII.

ii.  Common Law Fraud & Misrepresentation (Counts IX & X)

RJR alleges that Wellington's failure to disclose the existence of the non-competition agreement and its intent to enforce that agreement constituted common law fraud (Count IX)

40

and negligent misrepresentation (Count X). The allegations contained in these counts are substantively the same as those in the counts alleging breach of duty of loyalty and breach of duty to disclose under ERISA. To the extent that they address omissions and misrepresentations beyond the scope of fiduciary duty under ERISA, these claims are preempted. To the degree they do not, they are replicative. Accordingly, I will grant Wellington's motion for summary judgment on Counts IX and X.

### iii. Mass. Gen. Laws ch. 93A (Count XI)

RJR argues that Wellington's conduct constitutes unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11. To recover under ch. 93A, § 11, RJR must show that Wellington's conduct falls "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or is "immoral, unethical, oppressive or unscrupulous." PMP Assoc., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Specifically, RJR must show that (1) Wellington carried out unfair or deceptive acts or practices; (2) those acts or practices occurred substantially in Massachusetts; and (3) the plaintiff suffered an economic loss as a result of those acts. Datatrend, Inc. v. Jabil Circuit, Inc., 3 F. Supp.2d 66, 77 (D. Mass. 1998).

Certain litmus tests used to evaluate whether a colorable sec. 11 violation exists include vivid but ultimately uninstructive phrases such as "level of rascality" (Levings v. Forbes & Wallace, Inc. 8 Mass. App. Ct. 498 (1979) and "rancid

41

flavor of unfairness" (<u>Atkinson v. Rosenthal</u>, 33 Mass. App. Ct.
219, 226 (1992). <u>See</u> <u>Cambridge Plating Co. v. NAPCO, Inc.</u>, 35
F.3d 752, 768 (1st Cir. 1996); <u>Mass. Employers Ins. Exch. v.
Propac-Mass, Inc.</u>, 420 Mass. 39, 42-43 (1995) I must focus,
instead, on the nature of the challenged conduct and on the
purpose and effect of that conduct as the crucial factors in
making a ch. 93A fairness determination. <u>Mass. Employers Ins.
Exch. v. Propac-Mass, Inc.</u>, 420 Mass. at 42-43 (1995). That
focus makes clear that the ch. 93A claims here are at the
heartland of the field occupied by ERISA. Consequently, I will
grant Wellington's motion for summary judgment as to Count XI.

### B.   RJR's Motion for Summary Judgment

I now turn to RJR's motion for summary judgment on
Wellington's three counterclaims.

### 1.   Aiding and Abetting a Breach of Fiduciary Duty (Count I)

Wellington alleges that Schneider breached his fiduciary
duty to Wellington and that RJR aided and abetted this breach.
Massachusetts does recognize a cause of action for aiding and
abetting a breach of fiduciary duty. <u>Spinner v. Nutt</u>, 417 Mass.
549, 556 (1994); <u>Augat, Inc. v. Aegis, Inc.</u>, 409 Mass. 165, 172
(1991). To recover on this action, "the plaintiff must show that
the defendant knew of the breach and actively participated in it
such that he or she could not reasonably be held to have acted in
good faith." <u>Spinner</u>, 417 Mass. at 556. The First Circuit
states that aiding and abetting requires "the provision of
substantial assistance" and more than "an arm's length business

42

relationship."  <u>Schultz v. Rhode Island Hosp. Trust Nat'l Bank,</u>
<u>N.A.</u>, 94 F.3d 721, 730 (1st Cir. 1996).

An employee violates his duty of loyalty when he solicits
his employer's customers while still working for his employer.
<u>Augat</u>, 409 Mass. at 172.  Wellington can certainly produce
sufficient evidence to create a genuine issue that Schneider
solicited RJR while still employed by Wellington.  Schneider also
clearly violated his non-competition agreement by continuing to
work for RJR after he left Wellington.  Wellington can further
establish that RJR knew about Schneider's non-competition
agreement at the time it negotiated with Schneider to keep its
funds with him.  (MacMurray Aff., Ex. A to Blank Aff., ¶ 24.)

However, RJR's knowledge that Schneider would be violating
his non-compete is an insufficient basis upon which to maintain a
claim for aiding and abetting, particularly when RJR's own
contract with Wellington gave it the right to "direct" transfer
to the entity of its choice.  Moreover, RJR and Schneider were
plainly in an arms length business relationship, with RJR
deciding that keeping its portfolio with Schneider was in its
best business interest.  (<u>Id.</u> ¶ 25.)  RJR was not secretive about
its intentions.  MacMurray asserts that he told Wellington in
August that he hoped to speak to Schneider about Schneider's
plans and in November that he planned to keep the funds with
Schneider.  (<u>Id.</u> ¶¶ 24, 28.)  Wellington offers no evidence to
the contrary, instead pointing to misleading statements by
Schneider to Wellington and to RJR's failure to affirmatively ask

43

if Wellington planned to enforce the non-compete.   (Mem. of Law
in Opp'n to RJR Nabisco, Inc.'s Mot. for Summary Judgment
("Wellington Mem. II"), at 11-12.)

RJR cannot be held liable for Schneider's misleading
statements, and failure to ask about the non-compete falls well
short of the "active participation" required for aiding and
abetting liability.   Indeed, RJR cannot even be said to have been
misleading Wellington with silence, because MacMurray expressed
to Wellington his intention to follow Schneider.[5]   Similarly,
Wellington has not identified any evidence to support its
assertion that RJR's negotiations with Wellington about a
possible replacement were a sham.   Wellington has produced no
evidence that RJR's conduct was "such that [RJR] could not
reasonably be held to have acted in good faith."   <u>Spinner</u>, 417
Mass. at 556.   As a result, I will grant RJR's motion for summary
judgment as to Count I.

## 2.  Restitution (Count II)

Wellington asks for restitution to the position it was in
before RJR's and Schneider's wrongful conduct occurred.   As
Wellington concedes, restitution is not a separate cause of
action, but rather a remedy.   (Wellington Mem. II at 15.)   <u>See</u>
<u>Urman v. South Boston Sav. Bank</u>, 1994 WL 878815, at *1 (Mass.

---

[5]Indeed, Wellington's internal memoranda suggest that an
inquiry by RJR might have changed little, because Wellington
consciously omitted to mention the agreement, "dodged the
question" when asked by other clients about following Schneider,
and concluded as late as October that clients could "do whatever
they want" with their money.   (Blank Aff., Ex. B at 1, 2.)

Super. Ct. Oct. 19, 1994), aff'd, 424 Mass. 165 (1997).
Wellington contends that restitution is an appropriate remedy for
a breach of fiduciary duty.  See Restatement (First) of
Restitution § 138 (1937).  Since I have decided to grant summary
judgment on Wellington's claim of aiding and abetting a breach of
fiduciary duty, I must also grant summary judgment on any remedy
corresponding from that claim.  I will allow RJR's motion for
summary judgment on Wellington's Count II.

### 3.   Tortious Interference with Contract (Count III)

Wellington asserts that RJR intentionally induced a breach
of Schneider's non-competition agreement with Wellington.  To
recover for interference with a contract, Wellington must show
"something more than intentional interference," specifically
"improper motives or improper means."  United Truck Leasing Corp.
v. Geltman, 406 Mass. 811, 815-816 (1990); James L. Miniter Ins.
Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1250 (1st Cir.
1997).  A motive to benefit oneself financially is insufficient
to trigger liability.  See United Truck Leasing, 406 Mass. at
817.  See also Adcom Prods., Inc. v. Konica Bus. Machs. USA,
Inc., 41 Mass. App. Ct. 101, 105 (1995), review denied, 423 Mass.
1111 (1996) (finding improper motive where jury could find that
decision "was based on retaliation or ill will ... rather than
the good of the ... company").

In this case, RJR asked Schneider to continue to perform
investment management services for RJR in knowing violation of
his non-competition agreement.  This action at least conceivably

45

resulted in Wellington losing the RJR account (see below) and, in any case, caused Wellington to incur legal costs in enforcing the agreement.  See M.F. Roach Co. v. Town of Provincetown, 355 Mass. 731, 732 (1969) (awarding costs of litigation to a party who had to sue to enforce a contract when breach had been induced by a third party).  The only issue here is whether RJR had an improper motive or used improper means.  Wellington points to Kurker v. Hill, 44 Mass. App. Ct. 184 (1998), in which the Massachusetts Appeals Court apparently (although not very explicitly) found that the improper means requirement may be fulfilled by a breach of fiduciary duty by the party who breached the contract.  Id. at 191-92.  However, the Kurker decision draws this conclusion from a statement in United Truck Leasing that a party may have used improper means if he "violated a statute or a rule of common law."  Kurker, 44 Mass. App. Ct. at 191; United Truck Leasing, 406 Mass. at 817.  In this case, where RJR is not liable for aiding and abetting Schneider's breach of fiduciary duty, as explained above, Schneider's breach in and of itself cannot constitute improper means used by RJR.  To hold otherwise would be essentially to negate United Truck Leasing's requirement of something more than just intentional interference to confer liability.

Here, Wellington has produced no evidence showing that RJR had an improper motive for inducing Schneider to breach his non-compete; rather, the evidence indicates that RJR was motivated simply by its own economic interest, which Massachusetts courts

have explicitly found not to be an improper motive.  Moreover,
RJR was acting in furtherance of its contract with Wellington
which actually required Wellington to transfer the account to the
entity of RJR's choice.  Wellington has produced no evidence that
RJR violated statutory or common law duties or used other
improper means in inducing Schneider to breach the agreement.
Accordingly, I must grant summary judgment on Wellington's Count
III.

**5.  Additional Discovery**

Wellington has asked for a stay and leave to conduct
additional discovery pursuant to Fed. R. Civ. P 56(f) in the
event that I find summary judgment appropriate.  (Wellington Mem.
II at 16-18.)  Specifically, Wellington seeks to depose MacMurray
and another RJR official, Edward Robertiello, and to request
additional documents from RJR.  Wellington asserts that this
additional discovery will likely provide information that RJR had
detailed knowledge about Schneider's discussions with Wellington
and particularly that RJR gained information from and discussed
strategy with the other two Wellington clients who followed
Schneider.  (Id.)  Wellington cites, as the basis for believing
it will uncover this information, similar information discovered
from Russell, a similarly situated client, as well as MacMurray's
statements that he was in contact with Schneider's two other
potential clients and that he consulted with others at RJR in
late 1996 about the future of the funds. (Id.)

The First Circuit has stated that "district courts should

47

construe motions that invoke [Rule 56(f)] generously."
Resolution Trust Corp. v. North Bridge Assocs., Inc., 22 F.3d
1198, 1203 (1st Cir. 1994). Nonetheless, I will deny the request
for additional discovery. Wellington has not shown, as the First
Circuit requires "good cause for the failure to have discovered
the facts sooner." Id. Wellington has been litigating
essentially this case in four different fora for more than two
years. It has already participated in a trial in Superior Court
in which MacMurray and Schneider were cross-examined, and it has
conducted extensive depositions and document review in its
litigation with Russell. In addition, the evidence Wellington
seeks would likely have been relevant in defending against RJR's
claims as well as in pursuing its own. Yet Wellington has given
no reason for its failure to this point to discover greater
knowledge and culpability on the part of RJR. "The bare hope
that additional discovery will provide the factual support that
past discovery has failed to muster is insufficient to thrust
aside a well-grounded motion for summary judgment." Buckley v.
American Honda Motor Co., 780 F.2d 1, 2 (1st Cir. 1985).

Ultimately, however, Wellington's claims fail because RJR's
involvement with Schneider involved nothing other than an arm's
length business relationship in furtherance of its contractual
rights under is agreement with Wellington an improper motive or
means under governing law this is neither lack of good faith or
to interfere with the non-competition agreement. The discovery
that Wellington seeks and the information it hopes to gather

48

appears instead to primarily be helpful in showing greater knowledge by RJR of Schneider's negotiations with Wellington and his intention to breach than Wellington has thus far established. Such information, if it does exist, will not bring Wellington any basis to reflect summary judgment. "Discovery is not `a fishing expedition'; parties must disclose some relevant factual basis for their claim before requested discovery will be allowed.'" Milazzo v. Sentry Ins., 856 F.2d 321, 322 (1st Cir. 1988). Wellington cannot. I will not permit Wellington further discovery.

### IV.  CONCLUSION

For the reasons set forth above:

1.  Wellington's motion to strike is GRANTED to the extent that I will strike the following portions of the affidavit of Robert Schultz:  the third and fourth sentences of ¶ 4; the first, second, and fifth sentences of ¶ 5; the second, third, and fourth sentences of ¶ 6.  The motion is otherwise DENIED.

2.  Wellington's motion for summary judgment is GRANTED as to Counts I-IV and VI-XI and as to Count V with regard to all contentions except that for a breach of ¶ 16 of the Investment Management Agreement, concerning which it is DENIED.

3.   RJR's motion for summary judgment on Wellington's counterclaims is GRANTED in its entirety.

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE